**GARO B. GHAZARIAN (State Bar No. 152790)**
**LAW OFFICE OF GARO B. GHAZARIAN, APC**
**15915 Ventura Boulevard, Suite 203**
**Encino, California 91436**
**Telephone (818) 905-6484**
**Facsimile (818) 905-6481**
**Email: gbglaw@sbcglobal.net**

Attorney for Defendant
HOVHANNES NAZARYAN

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:22CR-00041-1 |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S OBJECTIONS TO** |
| | ) | **THE PSR, SENTENCING** |
| v. | ) | **MEMORANDUM AND EXHIBITS** |
| | ) | **"A" THROUGH "F" IN SUPPORT** |
| HOVHANNES NAZARYAN, | ) | **THEREOF** |
| | ) | |
| Defendant. | ) | Sentencing Date: May 2, 2024 |
| | ) | Court: Hon. John A. Kronstadt |

TO THE CLERK OF THE U.S. DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA; TO ASSISTANT U.S. ATTORNEY, DAVID H. CHAO; AND, TO THE UNITED STATES PROBATION OFFICE:

Defendant Hovhannes Nazaryan through his attorney of record, Garo B. Ghazarian, hereby submits his objections to the PSR and Defendant's Sentencing Memorandum for the Court's consideration.

This memorandum and the accompanying exhibits are submitted in support of defendant Nazaryan's request for a sentence that is sufficient, but not greater than necessary to fulfill the purposes of sentencing; and, a sentence which serves the interests of justice and accommodates the sentencing purposes set forth in Title 18, United States Code § 3553(a).

1

Date: April 18, 2024                    Respectfully submitted,

LAW OFFICE OF GARO B. GHAZARIAN, APC


By:  /s/Garo B. Ghazarian
     GARO B. GHAZARIAN
     Attorney for Defendant
     HOVHANNES NAZARYAN

# I.

## INTRODUCTORY COMMENTS

On August 24, 2023, Hovhannes Nazaryan, age 44, pleaded guilty to one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. §1349. The charge arises from Mr. Nazaryan's participation in a scheme in which he and other conspirators, including his co-defendant (who is also his brother) made fraudulent purchases on credit cards obtained illicitly, using identities of J-1 Visa holders who no longer lived in the United States (Presentence Report, Pages 5-6, ¶14). Mr. Nazaryan was arrested on February 15, 2022 and was released on bond 10 days later. He has been in full compliance with all of the conditions of his release over the past two years (Presentence Report, Page 5, ¶9).

In the advisory guideline summary presented in the Presentence Report (hereinafter "PSR"), the Probation Officer calculates a total offense level of 26, which at Criminal History Category II would produce an advisory guideline range of 70 to 87 months. The Probation Office recommends a low-end sentence of 70 months and restitution of $3,252,826.12 (Recommendation Letter, Page 1).

The PSR's proposed calculation (PSR, Pages 9-14, ¶¶38-72) derives from a base offense level of 7 [U.S.S.G. §2B1.1(a)(1)]; a 16-level increase for loss amount of more than $1.5 million but less than $3.5 million [U.S.S.G. §2B1.1(b)(1)(I)]; a two-level increase for number of victims [U.S.S.G. §2B1.1(b)(2)(A)(i)]; a two-level increase for sophisticated means [U.S.S.G. §2B1.1(b)(10)(C)]; a two-level increase for unlawful use of means of identification [U.S.S.G. §2B1.1(b)(11)(C)(i)]; and a three-level reduction for timely acceptance of responsibility [U.S.S.G. §§3E1.1 (a) and (b)].

In the Plea Agreement, the parties stipulate to a base offense level of 7 [U.S.S.G. §2B1.1(a)(1)]; and a two-level increase for use or possession of means of identification transferred from other means of identification [U.S.S.G. §2B1.1(b)(11)(C)]. As to loss amount, the parties agreed that loss should add either 14 or 16 levels, depending on whether the approximately $3.2 million amount relied upon by the PSR is utilized, or the figure of "at least" $1,289,265 as referenced in the Plea Agreement is adopted (see Plea Agreement, Page

11, lines 3-22). The Government also reserves the right to argue for enhancements for number of victims and sophisticated means. Both parties reserve the right to argue for a sentence outside of the advisory guideline range (Plea Agreement, Page 11, lines 23-28 and Page 12, lines 1-19).

Mr. Nazaryan, through counsel, objects to the extra 2-level increase for loss amount, which is premised on the mistaken notion that all of the credit cards falsely obtained were opened using an address connected to him, and that they were opened in the name of victims whose personal identifying information (PII) was found during execution of a search warrant at Mr. Nazaryan's property. As explained further below, the Government is making a dubious request that Mr. Nazaryan's guidelines should be elevated based on their insistence that said assumption (loss of $3.252 million vs. loss amount of $1.289 million) is correct. Also discussed below is the defendant's objection to the sophisticated means increase. Absent these unwarranted increases, Mr. Nazaryan's total offense level would be 22, which, at Criminal History Category II, produces an advisory guideline range of 46-57 months.

Given the totality of factors in mitigation that is present in this case, the Court is urged to apply a modest downward variance of ten months and impose a total sentence of 36 months. Such a sentence would be "sufficient, but not greater than necessary" to effectuate justice and would satisfy the factors set forth at 18 U.S.C. §3553(a)(2)

## II.

## ACCEPTANCE OF RESPONSIBILITY

Hovhannes Nazaryan is humbled to stand before this Court for sentencing and he takes full responsibility for his actions. He is ashamed and chagrined that he will be separated from his family because of his misdeeds. His grief at the ramifications of his shortsighted behavior is deep and genuine. In his attached letter to the Court, Mr. Nazaryan states:

> It is with great emotional difficulty that I try to find the appropriate words to express the extent of my remorse over my shameful criminal actions. Looking back at a life of wasted opportunities based on careless decisions brings a difficult

emotion of regret.  I realize that the decisions I made throughout my life have brought me to this point.

I will not seek to minimize my past wrongdoings.  I have come to learn that while some people learn from a single mistake, unfortunately, in my case, it took more than one mistake and one encounter with the criminal justice system for me to grasp the significance and the consequences of my wrong choices…

Your Honor, please accept my apology and my heartfelt commitment to make amends and restore the harm caused by my misconduct, I also want to assure the court that in my case, I have reached a point of no return.  The point of no return to a life of wrong choices or criminal behavior. The point of no return, whereby, I want to continue my life being a productive member of society, a good father to my children, and a good brother, son, and a member of my community. (Letter from Mr. Hovhannes Nazaryan, attached as Exhibit "A").

### III.

### ADVISORY GUIDELINE FACTORS

**A.** **The Proposed Additional 2-Level Increase for Loss Amount (+16 instead of +14) is Unwarranted**

In Mr. Nazaryan's case, the $1,289,265 loss amount referred to in the plea agreement is based on two criteria: 1) Loss is connected to illicit credit accounts connected to an address used by Mr. Nazaryan, and 2) Accounts were opened in the name of victims whose Personal Identifying Information (PII) were found during execution of the search warrant by case agents.

The much higher loss amount of $3,252,826.12, as requested by the Government, is based primarily on information contained in a flash-drive recovered in the search of an office address associated with Mr. Nazaryan.  No firm connection other than that has been offered in support of this elevated loss amount, the calculation of which specifically ignores the fact that compromised PIIs are routinely sold and re-sold on the black market to persons involved in credit card fraud, who then go about seeking to maximize the yield from their ill-gotten information.  In sum, the purported evidence contained in the flash drive is not even remotely sufficient to assess a $3.2 million loss culpability, either for purposes of restitution or to determine the sentencing guideline loss calculation.

Beyond that, there is a growing consensus that the advisory guidelines for economic loss can be seriously flawed.  Unlike most Sentencing Commission guideline policy decisions, these particular guidelines did not result from the painstaking, empirical analysis which was the hallmark of the Commission's original studied approach to calibrating the sentencing guidelines.  Rather, the economic loss guidelines are primarily the product of the Sentencing Commission's non-empirical acquiescence to political pressure.

In a 2021 article in the *Ohio State Journal of Criminal Law,* authors Barry Boss and Kara Kapp argue that sentencing recommendations based solely on the economic crimes sentencing guidelines are arbitrary and disproportionate.  From an extensive review of the history of the advisory guidelines, Boss and Kapp find that this has been the case since virtually the beginning and the result has been unwarranted sentencing disparities among similarly situated offenders based purely on the jurisdiction in which a defendant is prosecuted.  The authors note that as far back as the 1980s, the Sentencing Commission "deviated from its standard practice of anchoring the recommended sentencing ranges in the empirical data" and that "Section 2B1.1's loss enhancement is entirely untethered from its empirical roots, fails to effectively address the policy concerns animating this deviation from prior judicial practice, and has lost the confidence of a great many jurists."[1]

---

[1] http://moritzlaw.osu.edu/sites/default/files/202110/how%20the%20economic.pdf.  (Pages 609 and 628).

Drilling down further, Boss and Kapp find that judges depart or vary below the Guidelines in the majority of cases in which the §2B1.1 loss enhancement applies:

> The downward variances given to such offenders, moreover, are typically significant. The mean sentences imposed on fraud offenders in 2018 and 2019 were 21 and 20 months respectively, more than 50 percent below the low end of the Guideline range. Likewise, the median sentences imposed on fraud offenders in 2015 through 2019 were 12, 15, and 16 months, 45 to 50 percent below the low end of the Guideline range.[2]

In 1989, the loss table was recalibrated to increase enhancements based on loss amount [Amendment No. 154 (Nov. 1, 1989) U.S.S.G. §2F1.1].  "This increase was not in response to a congressional directive, nor was it based on empirical evidence or national experience."  When what became a series of increases was first implemented it was at increments of one level for loss amounts up to $350,000.  By 2001 [Amendment. No. 617 (Nov. 1, 2001) U.S.S.G. §2B1.1] the same loss amount triggered an increase of four levels.[3] This obviously resulted in defendants sentenced under §2B1.1 receiving far longer sentences. Once again, however, the impetus for the increase did not come from the sentencing commission findings, but from politicians seeking to curry favor with the public through "get tough on crime" legislation.

Increasingly since the advent of <u>United States v. Booker</u>, 543 U.S. 220 (2005), and its progeny, sentencing judges have been opting not to rely solely on the Guidelines under §2B1.1 to determine the proper length of punishment for fraud offenses.  Instead, judges have implemented sentences based on a careful appraisal of the totality of circumstances, with particular emphasis on the 18 U.S.C. §3553(a) factors.

---

[2] Page 622.

[3] https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/deconstructing_the_guidelines/table-of-amendments-to-fraud-guidelines-ussg-2b1-1-and-2f1-1-1988-2013.pdf.

**B.     The  2-Level increase for Sophisticated Means is Unwarranted**

Mr. Nazaryan also objects to the Probation Officer's recommended 2-level increase for "sophisticated means."  To support its recommendation (PSR, Page 11, ¶¶53-55), the Probation Office asserts that Mr. Nazaryan, along with his co-conspirators, "intentionally sought out foreign individuals with social security numbers so they could commandeer their identities for his own personal gain."

U.S.S.G. §2B1.1, App. Note 9(B) states in part:

> 'Sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense…  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

By this definition, Mr. Nazaryan's conduct does not rise to the level of "sophisticated means" because he did not come close to using "fictitious entities, corporate shells, or offshore financial accounts."  He simply, foolishly, and ill-advisedly accessed personal information of J-1 visa holders, taking no other particularly elaborate special measures to conceal the offense or avoid detection.

With regard to both of the enhancements under discussion here (the extra 2-level increase for loss amount, and sophisticated means), it is noted that the Sentencing Commission has recognized the piling-on problem of "factor creep," in which, as "more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness" [U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 137 (2004)].  And while Defendant Nazaryan, through undersigned counsel, does not specifically object to the other proposed specific offense characteristics (for number of victims, and for possession, use or transfer of a means of identification) those certainly

contribute to the accumulation here of excessive, overlapping enhancements that are, to a large extent, duplicative of one another.  The end result is a textbook example of "factor creep," and an advisory sentencing range that is unduly high and onerous.

In 1999, Justice Breyer warned that "[t]here is little, if anything, to be gained in terms of punishment's classical objectives by trying to use highly detailed offense characteristics to distinguish finely among similar offenders.  And there is much to be lost, both in terms of Guideline workability and even in terms of fairness (recall the Guidelines' logarithmic numerical scales)...  The precision is false."  [See Justice Stephen Breyer, Federal Sentencing Guidelines Revisited, 11 Fed. Sent'g Rep. 180, 1999 WL 730985, at *11 (1999)].

Justice Breyer's warning against the "piling on" of guideline adjustments is apposite in this case.  Mr. Nazaryan committed a rather mundane and typical credit card fraud in which the base offense level and the properly calculated loss amount should be the driving guideline factors, without being further elevated by a bevy of overlapping and largely redundant specific offense characteristics.

Based on the Ninth Circuit decision in United States v. Staten, 466 F.3d 708 (9th Cir. 2006), it is well settled that enhancements that cause a disproportionate impact on sentences must be established by clear and convincing evidence.  The Staten Court set forth:

> In short, neither the holdings nor the reasoning of our prior case law concerning heightened burdens of proof at sentencing are irreconcilable with Booker.  We hold, accordingly, that this circuit's established rule, requiring facts found in support of the Guidelines enhancements that turn out to have a disproportionate impact on the ultimate sentence imposed to be established by clear and convincing evidence, continues to govern sentencing decisions.

The Ninth Circuit reiterated the controlling authority of Staten in its published ruling in United States v. Adam Gardenhire, 784 F.3d 1277 (9th Cir. 2015), in which it reversed the District Court's application of an enhancement for reckless endangerment.  In light of the

9

sentencing increase that would have resulted, the Court found it to be particularly important that the government be held to its burden of proof and that enhancements be supported by clear and convincing evidence:

> The government did not show by clear and convincing evidence that Gardenhire was aware of the risks created by his conduct.  In applying the recklessness enhancement, the district court materially erred, resulting in a miscalculated Guidelines range. We vacate Gardenhire's sentence and remand for resentencing. (Id., Page 18.)

In Gardenhire, the Court further reiterated:

> Generally, the party seeking to adjust an offense level must establish that the adjustment is merited by a preponderance of the evidence, but the burden increases to clear and convincing evidence if the adjustment will "have a disproportionate impact on the ultimate sentence imposed."  United States v. Staten, 466 F.3d 708, 720 (9th Cir. 2006); see Gonzalez, 492 F.3d 1031 at 1039.  In Gonzalez, we concluded that the heightened standard was appropriate for the nine-level recklessness enhancement under U.S.S.G. §2A5.2(a)(2)(A). 492 F.3d 1031 at 1039-40. (Id., Page 7, Footnote 3.)

This Court would be on solid ground if it were to rule that the enhancements for the additional 2-level increase for loss amount and for sophisticated means do not rise to the required evidentiary threshold, as they have not been established by either a trier of fact or by "clear and convincing evidence."

Eliminating the specific offense characteristic for sophisticated means and the extra 2-level increase for loss amount in Mr. Nazaryan's case would result in a total offense level of 22, which at Criminal History Category II, would produce an advisory Guidelines range of 46-57 months -- not far above the requested sentence of 36 months.

# IV.

## DEFENDANT'S PERSONAL HISTORY AND CHARACTERISTICS SUPPORT THE REQUESTED SENTENCE OF 36 MONTHS

In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the U.S. Supreme Court advised that in addition to considering the Guidelines, the "district court should…consider all the 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the court] may not presume that the Guidelines range is reasonable.  [The court] must make an individualized assessment based on the facts presented."  <u>Gall</u> at 596-597.

Furthermore, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'"  <u>Pepper v. United States</u>, 562 U.S. 476 (2011) quoting <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996).  The Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'"  <u>Id</u>. at 1240, quoting <u>Williams v. People of the State of New York</u>, 337 U.S. 241, 247 (1949).  The Supreme Court has "emphasized that [h]ighly relevant – if not essential – to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

In keeping with the above, the following social history information about Mr. Nazaryan is presented to the Court in the spirit of 18 U.S.C. §3661, which states that "no limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

## A.   General Family Information

Hovhannes Nazaryan was born on April 1, 1980 in Yerevan, Armenia.  He is the second of two sons born to Aslan Nazaryan, 66, and Lala Tatevisyan, 67.  His father worked in the food service industry and was for a time the private chef for the U.S. military attaché at the American Embassy in Yerevan.  His mother worked as a bank teller.  Hovhannes has

one sibling.  His brother, codefendant Artur Nazaryan, is 41 and resides in North Hollywood, California with their parents, for whom Artur serves as primary caretaker.

Hovhannes has been married twice and is the father of two daughters, one from each of his marriages.  He and his first wife, Perla Ayala, 41, were married from 2004 to 2009. They have one daughter, Anahid Nazaryan, 17.  Anahid lives with her mother in Monrovia, California and is a student at Monrovia High School.  Hovhannes married Ani Israelyan, 38, in 2009.  They have been separated since 2018 and have one child together, Alina Nazaryan, age 9.  Alina lives with her maternal grandmother in Glendale, California.

**B.    Upbringing in Armenia**

Hovhannes grew up in difficult circumstances in Armenia.  Although his home life was secure, when Armenia became independent following the Soviet Union's dissolution in 1991, Armenia entered into a devastating transitional period.  The political strife that followed the break-up of the Soviet Union included violent ethnic conflict between Armenia and neighboring Azerbaijan.  A state of emergency was declared in November 1988, by which time thousands of ethnic Armenians were fleeing Azerbaijan and returning to Armenia.  Hostilities along the Armenian-Azerbaijani border have included a series of wars fought between the two countries and persist to the present.

Hovhannes recalls that for much of his youth, Armenia was "under siege" and it became a daily struggle to obtain basic necessities.  Food was scarce and electricity and fuel were rationed.  On top of ethnic and political tensions, two major earthquakes centered not far from Yerevan occurred in quick succession in December of 1988, when Hovhannes was eight years old.  These quakes caused widespread damage and loss of life.  An estimated 60,000 people died and much of the nation's housing stock was destroyed.  Despite lingering Cold War tensions, Soviet leader Mikhail Gorbachev formally asked the United States for humanitarian help within a few days of the quakes, the first such request since World War II. For the next several years, supplies of running water and electricity were intermittent or non-

existent. Bread was rationed and Hovhannes and his brother Artur, among thousands of others, stood in long lines to obtain food and basic necessities.

Despite these difficulties, Hovhannes was able to finish high school in Armenia in 1996. He then attended college in Yerevan and continued his studies, while completing two years of compulsory military service.

## C.    Relocation to the United States

The connection between Armenia and Southern California is longstanding. Armenian immigrant families have established roots in this area since the early part of the last century, and in recent decades there has been an increase in immigration from that country. Most Armenians in the greater Los Angeles area have arrived since the collapse of the Soviet Union in 1991. The Los Angeles metropolitan area now is home to one of the largest Armenian diaspora communities in the world. Hovhannes's parents' goal of immigrating to California was facilitated by his father's employment connection to the American Embassy in Yerevan. His parents settled in North Hollywood first, and then Hovhannes joined them a few years later in 2003.

Hovhannes initially moved in with his parents, who were then living with an elderly couple in North Hollywood for whom they were caretakers. This arrangement ended abruptly when Hovhannes and his parents had a falling-out with the couple's adult son. Unable to acquire replacement jobs due to their age and slipping health, the parents gradually became reliant on Hovhannes for support. In time, Hovhannes was able to achieve U.S. citizenship and he then sponsored his parents to also become citizens.

Hovhannes originally worked in the jewelry business as an engraver and stone setter, a trade he had been introduced to in Armenia. He worked at first in Glendale, and subsequently obtained more skilled and better-paying positions in the jewelry district in downtown Los Angeles. Hovhannes supplemented his income from the jewelry trade as a limousine driver on weekends, and for quite a few years he worked seven days a week.

From 2010 until 2017, Hovhannes was self-employed in the trucking business. He purchased an 18-wheeler and over time his business grew to the point where he had ten trucks operating under two corporations. Hovhannes left the trucking industry when rates for hauling stagnated, at the same time as his trucks were becoming older and too expensive to maintain. After he left the trucking business Hovhannes opened a gardening supply store in North Hollywood that he managed until December 2022. Since closing that business, he has supported himself primarily through income from vehicle rentals and property rentals in the San Fernando Valley.

**D.    Marriage and Family Life**

Hovhannes married his first wife Perla Ayala in 2004. The couple stayed together for two years and had one child, Anahid Nazaryan, 17. Anahid lives with her mother Perla in Monrovia, California. Hovhannes was married a second time to Ani Israelyan, from 2009 until 2018. Hovhannes and Ani are still in divorce proceedings. They have one child, Alina Nazaryan, age 9, who lives with her maternal grandmother in Glendale. Hovhannes and Ani are estranged and his contact with Alina is therefore sometimes limited.

Hovhannes does remain close with his first wife Perla and their daughter Anahid. In her appended letter to the Court, Perla offers:

> I am writing this character letter to express my sincere appreciation for Hovhannes Nazaryan as a father to our daughter, Anahid Nazaryan. Despite the challenges that come with co-parenting, I believe it is important to recognize the positive qualities and efforts of each parent, particularly when it comes to the well-being of our child. Throughout the years, I have witnessed firsthand the love and care that Hovhannes Nazaryan has consistently shown towards Anahid Nazaryan. His dedication to her happiness and emotional well-being has been unwavering. Hovhannes Nazaryan has always prioritized

spending quality time with Anahid Nazaryan, making sure she feels loved, supported, and valued.   One of Hovhannes Nazaryan's greatest strengths as a parent is his ability to create memorable experiences and foster a strong bond with Anahid Nazaryan.   Whether it's planning fun outings, engaging in meaningful conversations, or simply being there for her when she needs guidance.  His kindness, patience, and affectionate nature have undoubtedly left a lasting impression on her.  While we may have our differences as ex-spouses, I am grateful for the positive co-parenting relationship that Hovhannes Nazaryan and I have been able to maintain for the sake of our daughter. (Letter from Ms. Perla Kempenaar, attached as Exhibit "B").

Daughter Anahid Nazaryan writes:

From when my parents divorced, I have grown up the majority of the time with my mother, but never once have I ever felt left out by my father.  Bought me things when I didn't need them or took me to places just to spend time with me.  On my dad's side of the family we describe our father figures as the best in the whole world and that is the only way to describe him…

I know my father has done things that I am not proud of but his actions do not define his person as a whole.  I support any decisions that are made but I believe my father has learned his lesson since having his ankle monitor as a daily reminder of the consequences of breaking the law.  I would never condone my father's actions and his criminal charges as I find them very shameful.  I always strive to help him understand along the way of what is right and wrong.  I know he is definitely not perfect by

15

any means I would know, however he is still my father who I love very much.

In conclusion, from the very beginning it has unsettled the family, which left my grandparents heartbroken that he had done such a deed. However, I, as his daughter, plead to you your Honor, to see he is my father, to which already I don't see often because of how far he lives. I hope you find it in your heart to look past his actions and the case, considering all of his good qualities as a good father and a kind person. (Letter from Anahid Nazaryan, attached as Exhibit "C").

Hovhannes Nazaryan has remained very close to his parents. In his letter, Hovhannes's father writes to the Court:

The pressure he experienced to conform to an idealized version of the American dream has proven futile and regrettable. Upon learning of his criminal charges, I was deeply shaken, which posed additional concerns given my fragile cardiac health. Witnessing the repercussions of his associations and subsequent electronic monitoring has been profoundly distressing for our entire family. (Letter from Aslan Nazaryan, attached as Exhibit "D").

In her letter, Hovhannes' heartbroken mother describes Hovhannes's unwavering and unselfish care for his daughters. She writes about how much the kids depend on him and she begs for the Court's leniency:

I understand the gravity of the charges against my son, and I do not seek to diminish the seriousness of his action.

I believe that my son is remorseful for his actions and is committed to making amends. He understands the gravity of this situation and is willing to take responsibility for his mistakes. I ask for leniency in his sentencing, not just for his sake, but for the sake of his daughters, who need him in their lives. (Letter from Lala Tadevosyan, attached as Exhibit "E").

Hovhannes's uncle pleads for the Court's leniency and states that his dedication, love and support to his family is immeasurable:

Hovhannes is the type of man to go above and beyond for others, not out of obligation, but out of genuine care and concern. Especially, when it comes to family.

He's the one that, after my accident that left me confined to my bed for a short while, became my family's support and lifeline. Despite his own commitments as a husband and father of children himself, he would insist on driving me to work as soon as I was able to return, and he even took my kid to school so I could focus on getting better. Hovhannes's actions during one of the most challenging times of my life, helping me support my family, left me with a profound sense of gratitude and respect toward him. I'll never forget what he did for us, not many people would go to such lengths to help others.

Your Honor, I do not seek to excuse or justify Hovhannes's actions. He must be held accountable for any wrongdoing he has committed. However, I urge you to consider the full context of his life and character before passing judgment. I believe that Hovhannes is capable of redemption and rehabilitation. With the

17

support of his family, his community, and the guidance of the court, I have faith that he can learn from this experience and emerge as a better, more responsible individual.  (Letter from Daniel Vahanyan, attached as Exhibit "F").

## V.

**THE 18 U.S.C. §3553(A)(2) FACTORS SUPPORT THE REQUESTED SENTENCE OF 36 MONTHS IMPRISONMENT**

Under the principles set forth in <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are now, of course, purely advisory.  The Guidelines are one among a number of factors that sentencing courts are directed to assess in imposing a sentencing that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).  Neither §3553(a) nor <u>Booker</u> suggests that any of these factors is individually paramount.  All of them, however, are controlled by §3553(a)'s mandate to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing.

A plethora of appellate decisions from various circuit courts have clarified the role and approach of the sentencing court in the post-<u>Booker</u> era.  The Ninth Circuit has held that "Booker empowered district courts, not appellate courts.... [and] breathe[d] life into the authority of district court judges to engage in individualized sentencing."  <u>United States v. Whitehead</u>, 532 F.3d 991, 993 (9th Cir. 2008) (citations omitted).   The Ninth Circuit has also determined that in weighing the sentencing decisions of a district court, the proper standard is abuse of discretion, and it will not "second guess" the court's conclusions so long as they are reasonable.  <u>United States v. Menyweather</u>, 447 F.3d 625, 633 (9th Cir. 2006).

Further, the Seventh Circuit has stated that post-<u>*Rita*</u> "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence.*"  <u>United States. v. Sachsenmaier</u>, 491 F.3d 680, 685 (7th Cir. 2007) (referencing <u>Rita v. United States,</u> 551 U.S.

338 (2007)).  Under these principles, the court is at liberty to tailor a sentence to the individual defendant.  <u>United States v. Chavez</u>, 611 F.3d 1006 (9th Cir. 2010) (citing <u>Kimbrough</u>, 552 U.S. at 101).  Given the application and balancing of the factors in 18 U.S.C. §3553(a), the sentencing process necessarily involves an exercise in judgment, not a mathematical proof.  <u>United States v. Grossman</u>, 513 F.3d 592 (6th Cir. 2008).

As part of the sentencing calculus, in addition to weighing the "history and characteristics of the defendant" and the "nature and circumstances of the offense," both of which have been addressed in this memorandum, 18 U.S.C. §3553(a)(2) directs U.S. District Court judges to consider just punishment; deterrence; societal protection; and the aim of providing defendants with needed educational and vocational training ("correctional treatment").

## A.    <u>Just Punishment</u>

Based on the totality of the factors present in this case, including Hovhannes's clear contrition and his history of struggles with alcohol and substance abuse, the requested sentence of 36 months of imprisonment would constitute significant and just punishment in this matter.  This is particularly true considering that Hovhannes would be in his upper forties when released, at an age when the majority of offenders tend to "mature out" of criminal and anti-social behavior.  The consequences of illegal behavior have already been indelibly impressed upon him by the sheer fact of this prosecution.  The risk that he would reoffend or ever contemplate behavior that could return him to prison after serving a three-year term in Federal prison is remote.

## B.    <u>Deterrence</u>

With respect to deterrence, it is clear based on his remorse and determination to lead a clean, sober, and useful life moving forward that Hovhannes does not need to be imprisoned for more than three years to dissuade or deter him from future criminal conduct.  The fact that he has done so well during the past two-plus years while under supervision with electronic monitoring from Pretrial Services, with no violations or slip-ups of any type,

demonstrates his ability and resolve to adhere to the rules, and indicate that he has already been personally deterred from any further illegal involvements.

Similarly, a sentence of three years prison for a non-violent offender who has never before served jail time is amply punitive to deter others, thus achieving general, or societal, deterrence to the extent that any sentence can accomplish that goal.

**C.**     **Incapacitation/Societal Protection**

By the same token, Hovhannes does not now nor has he ever posed a physical threat to society. His crime did not involve weapons or violence. He has learned from this ordeal and is resolute in his commitment not to return to fraud or any other type of criminal activity. Hovhannes does not need to be incarcerated beyond three years to safeguard members of the public from further crimes on his part.

**D.**     **Correctional Treatment and Rehabilitation:  Hovhannes Nazaryan Respectfully Requests that the Court Recommend He Be Considered for the RDAP Program**

The Bureau of Prisons (BOP) provides numerous educational and vocational programs aimed at helping undereducated and underprivileged defendants to gain needed life skills that will serve them well upon their release from custody. The BOP also offers its 500-hour RDAP (Residential Drug and Alcohol Abuse) program to eligible defendants who have struggled with substance abuse.

Because of his military and educational background, his multiple job skills, and his experience in business, Hovhannes does not need to further his education nor does he require vocational training to walk a straight path going forward. However, he could clearly receive benefit from the RDAP program which would help Hovhannes to understand the psychological factors that led him to abuse drugs and alcohol in the first place. Accordingly, Hovhannes requests that the Court recommend him for designation to a facility where the RDAP program is available.

## VI.

## CONCLUSION

Hovhannes Nazaryan is not a callous criminal or sociopath.  He is a flawed man like many who, despite his intelligence and capacity for hard work, has made very serious mistakes of the type that bring him before this Court for sentencing.  Hovhannes readily acknowledges those mistakes and he feels profound regret and shame.  He understands that he is facing time in prison and separation from his family, an outcome for which he will never forgive himself.

Whatever sentence is ultimately imposed, Hovhannes Nazaryan will be punishing himself for his unlawful conduct for years to come.  It is submitted that given the totality of factors, a sentence of 36 months imprisonment, followed by Supervised Release with whatever punitive, restorative, rehabilitative and oversight conditions this Court finds warranted, would be "sufficient, but not greater than necessary" to satisfy the ends of justice and meet the aims of 18 U.S.C. §3553(a).

Date:  April 18, 2024          Respectfully submitted,

                              LAW OFFICE OF GARO B. GHAZARIAN, APC

                              By: /s/*Garo B. Ghazarian*
                                  GARO B. GHAZARIAN
                                  Attorney for Defendant
                                  HOVHANNES NAZARYAN

1

2

## TABLE OF EXHIBITS

3 **EXHIBIT A** — Letter of Hovhannes Nazaryan [Defendant]

4 **EXHIBIT B** — Letter of Perla Kempenaar [Defendant's ex-wife]

5

6 **EXHIBIT C** — Letter of Anahid Nazaryan [Defendant's daughter]

**EXHIBIT D** — Letter of Aslan Nazaryan [Defendant's father]
7

8 **EXHIBIT E** — Letter of Lala Tadevosyan [Defendant's mother]

9 **EXHIBIT F** — Letter of Daniel Vahanyan [Defendant's uncle]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28